IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Statesville Division)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 (Converted) |
| SANDRA DEE COLE, | ) | |
| | ) | Case No. 16-50322 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| MOON WRIGHT & HOUSTON, PLLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 17-05006 |
| | ) | |
| SANDRA DEE COLE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

FILED
U.S. Bankruptcy Court
of NC

SEP - 7 2017

Steven T. Salata, Clerk
Charlotte Division

## MOTION TO QUASH/MODIFY SUBPOENA, INTERROGATORIES, MOTION FOR PROTECTIVE ORDER, OBJECTION TO MWH'S MOTION TO EXTEND PRETRIAL DEADLINE, AND MOTION TO DISMISS COMPLAINT

NOW COMES Sandra Cole, (hereinafter "Debtor") pursuant to Rule 45 (d)(2)(B), Rule 45 (d)(3) and Rule 45 (e)(2) of the Federal Rules of Civil Procedure, and objects to and moves to quash the Subpoena issued to Collum & Perry (Doc 89-4), and, the second set of interrogatories issued by Moon Wright and Houston ("MWH") issued to Debtor (Attached hereto as Exhibit A). Further the Debtor moves for a protective order preventing the production of certain information protected by the attorney client privilege, spousal privilege, (HIPPA and the Defenseless Minor child of the debtor (MWH is NOW seeking the debtors daughters medical and schooling information), and an order to narrow the scope of MWH's interrogatories and subpoenas to their stated claim that the debtor did not intend to repay their fee for legal services.

During the last hearing held before this court the Honorable Judge Beyer advised the Plaintiff this case comes down to your (MWH) ability to demonstrate the debtor did not intend to pay your fees and intent is a very high hurdle to overcome but we will see. After depositions and discovery that included both the debtor and her spouse in the underlying civil case (wherein the Plaintiff made NO allegations of fraud against the debtor) and MWH lost on summary judgement and appeal against the defendants spouse, and, in this adversary proceeding following two 2004 examinations, a broad based far reaching (4 year) subpoena, 49 production requests, 60 admission requests, and a second set of duplicative interrogatories, **MWH HAS NOT BEEN ABLE (AND WILL NOT BECAUSE THEY CANNOT) produce one single shred of evidence to support their claim the debtor did not intend to pay the balance of the legal fees**.

To the contrary, what discovery and the documents responsive to MWHs subpoena revealed is the debtor almost immediately after MWH assisted in settling the underlying civil case trained and obtained a real estate license, and, secured two home listings and closed one home listing in December of 2015. The Contract for this transaction was filed with the debtors schedules to the trustee and provided to the MWH in response to its June 26, 2016 subpoena. **It is an undisputed fact the debtors actions demonstrate her "intent" to repay her obligations.** In support of this objection and Motion to Quash, the undersigned shows as follows:

1. On June 26, 2016 MWH issued a broad and vague subpoena reaching back four years in a standard bankruptcy case where no adversary proceeding had been filed at the time. in a standard bankruptcy case where no adversary proceeding had been filed.

2. Despite receiving the debtors real estate license and evidence she listed two

and sold one home in response to its June 26 subpoena (clearly indicating her "intent" to pay the balance of any legal fees she may have had) MWH filed an adversary proceeding alleging the debtor did not intend to pay the balance of her legal fees. **It is noteworthy to mention in the underlying civil suit related to the balance of its purported outstanding fees MWH's own Richard Wright <u>under deposition</u> stated he only had two calls and a handful of emails from the Debtor and claimed the debtors spouse, not the debtor caused MWH to incur its purported unpaid fees that MWH now seeks to recover from the debtor.**

3. Since the Debtor began representing herself Pro SE, MWH has unnecessarily and maliciously caused undue delay and burden by refusing to communicate with the debtor via email or telephonically and ONLY responds to email or phone inquiries via standard mail (See Attached hereto Exhibit B communications from MWH denying the Debtors request to communicate via email and telephonically).

4. After completing depositions, discovery, and preparing for trial in the underlying civil case, its broad based far reaching subpoena issued in this adversary proceeding, two 2004 exams, 49 production requests, 60 admission requests, and issuance of a second set of duplicative interrogatories (Exhibit A), MWH is now asking this court for even broader scope and authority to pierce the attorney client privilege, spousal privilege, and even further seeks medical and schooling information on a defenseless minor child in its second set of interrogatories (Exhibit A item 7 of "Interrogatories").

5. In reviewing Exhibit A, substantially ALL of the items MWH seeks belong to the debtors spouse and are related to the preparation of the debtors schedules using the debtors spouses' information with the exception of the attorney client and spousal privilege communications MWH now seeks. Of the first set of interrogatories and admissions and the second set of interrogatories only the admissions themselves (Exhibit B) contained questions or

3

were related to the debtors intent to pay.  More significantly, MWHs interrogatories do not contain allegations of missing documents but rather seek to burden the Debtor with the responsibility of organizing the documents provided in a specific format MWH would like to have the documents organized.

6.  October 7th, 2016, and on November 9th, 2016 and January 7th, 2017 the debtors spouse offered MWH in writing to provide clarification on all his documents submitted in response to MWHs June 26, 2016 Subpoena and sit and be subject to both of MWHs 2004 examinations.  MWH inexplicably declined and specifically stated they did not want the debtors spouse at the 2004 examination.  MWH declined the debtors spouse offers presumably because MWH knows even if they uncovered a transaction of the debtors spouse (debtor maintains that none exist) that would violate bankruptcy code those acts could not be imputed to the debtor (See Exhibit C).

7.  Despite having been granted maximum latitude and a four year look back in a standard bankruptcy proceeding where no adversary proceeding had been filed;

a.  MWH has not and will not because they cannot produce one scintilla of evidence that suggests the debtor did not intend to pay.  In fact, the evidence collected by MWH pursuant to its June 26, 2016 Subpoena shows clearly the debtor trained and obtained a real estate license and secured two listings and closed one in 2015, and

b.  Presumably, because the facts simply fail to support MWHs claims, as was the case in MWHs failed civil litigation wherein MWH lost on summary judgement and subsequent appeal, MWH has embarked on a concerted effort to unduly burden the debtor and delay trial by refusing to communicate or respond to emails and phone calls from the debtor by any means other than standard US mail, and,

4

c. MWH simply cannot prove the debtor "intended" not to pay the balance of its legal

bills. Instead, MWH is dragging the trial out seeking attorney client privilege

communication, spousal privilege communication, medical and schooling information

on the debtors' minor child, and clarification on the debtors' spouses' information

provided in response to its subpoena while denying the debtors spouses repeated offers

to provide the clarification. There are no reasonable means by which MWH can claim

obtaining this information would lead to any discoverable evidence to support its claim

the debtor did not intend to pay MWHs purported legal fees.

d. Any delays in pretrial preparation are quite simply self-inflicted wounds of the MWH.

It was MWHs' decision to limit communications to standard mail often taking seven

days for the debtor to receive a response to a simple email request.

**WHEREFORE**, the Defendant hereby pray the court as follows:

1. Given the fact the evidence obtained by MWH through its subpoena and

   admissions demonstrates the debtor clearly "intended" to pay her obligations,

   that the Plaintiff have and recover nothing against the Defendant, and that the

   adversary complaint against the debtor be dismissed, with prejudice;

2. Given the fact MWH engaged in actions such as limiting their responses to

   standard US Mail that cause unnecessary delay and undue burden to the debtor

   and court, that MWHs motion to extend the pretrial deadline be denied;

3. That the subpoenas issued by MWH including that issued to Collum and Perry

   be quashed or modified to include only those items (if any) that are responsive to

   MWHs claim the debtor did not intend to repay the balance of MWHs legal fees;

4. That the second set of interrogatories issued by MHW be quashed or modified to

   include only those items (if any) that are responsive to MWHs claim the debtor

did not intend to repay the balance of MWHs legal fees;

5.    That a protective order be entered regarding those documents that are protected

by attorney-client and spousal privilege.

6.    That a protective order be entered barring ANY requests or documents or

question's regarding the debtors minor child.

And such other relief as the court deems just and proper.

**SANDRA D. COLE**

By: _Sandra D. Cole_

Sandra D. Cole, *Pro SE*
143 SLEEPY COVE TRAIL
Mooresville, NC 28117
PHONE: 704.775.0704
EMAIL: *ssdcole16@gmail.com*

***Defendant, Pro Se***

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May, 2017, I caused a true copy of the foregoing

**MOTION TO DISMISS, MOTION FOR ATTORNEYS' FEES AND ANSWER** to be

delivered by first class mail, postage prepaid, to:

> Richard S. Wright, Esq.
> Moon Wright & Houston, PLLC
> 227 W. Trade Street, Suite 1800
> Charlotte, NC 28202
> Tel: (704) 944-6560
> Fax: (704) 944-0380
>
> *Counsel for Plaintiff*

By: _Sandra D. Cole_

> Sandra D. Cole, Pro SE
> 143 SLEEPY COVE TRAIL
> Mooresville, NC 28117
> PHONE: 704.775.0704
> EMAIL: ssdcole16@gmail.com
>
> Defendant, Pro Se

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) | Chapter 7 (Converted) |
| | ) | |
| **SANDRA DEE COLE,** | ) | Case No. 16-50322 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| **MOON WRIGHT & HOUSTON, PLLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 17-05006 |
| | ) | |
| **SANDRA DEE COLE,** | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S SECOND SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION TO DEFENDANT

Pursuant to Rule 7033 of the Federal Rules of Bankruptcy Procedure, Moon Wright & Houston, PLLC serves Sandra Dee Cole with the following interrogatories. Sandra Dee Cole is required to answer each interrogatory separately and under oath, and to forward her responses within thirty (30) days of service to Moon Wright & Houston, PLLC, Attention: Caleb Brown, 121 West Trade Street, Suite 1950, Charlotte, North Carolina 28202.

## INSTRUCTIONS REGARDING INTERROGATORIES

A.    "Amended Schedules" refers to the *Amended Means Test Calculation 122A-2, Statement of Income, Declaration, 106/206 Summary, Schedule J, Schedule I, Schedule A/B filed by Sandra Dee Cole,* filed in the Base Case on July 28, 2017. [Doc. 84].

B.    "Base Case" refers to the converted Chapter 7 bankruptcy case of Sandra Dee Cole pending in the United States Bankruptcy Court for the Western District of North Carolina bearing case number 16-50322.

C.    "Document" means every writing or record of every type or description whether printed, filmed, taped, recorded or reproduced by any mechanical process, or written or produced by hand that is or has been in your possession, custody or control, or of which you have knowledge, including without limitation, agreements, calendars, checks, communications, correspondence, drawings, letters, memoranda, pamphlets, pictures, plans, publications, receipts, records, releases reports, summaries or records of telephone conversations, summaries or records of personal

conversations or interviews, summaries of records of meetings or conferences, summaries or reports of investigations, stenographic or handwritten notes, surveys, tapes, and any other writings of whatever description in any form, including but not limited to any information contained in any computer, although not yet printed out and shall include any marginal comments appearing on such document, and every copy of any such writing not an identical copy of the original or where such copy contains any commentary or notation whatsoever which does not appear on the original and any other writing. In addition to the foregoing, "document" specifically includes text or images stored in electronic form (e.g., electronic mail and text messages).

D.    "Identify" when used in reference to an individual means give the full name, present residence and business address, telephone numbers, job descriptions, and business or other affiliation, if any, with you.

E.    "Identify" when used in reference to a document means state the name of the person who authored or originated the document, the date on which it was authored or originated, the location of the original of the document and all copies, and a brief summary of its contents.

F.    "You" or "your" refers to Sandra Dee Cole and any other persons and/or entities acting on her behalf.

G.    If you claim that any document requested to be identified is no longer subject to your control, then set forth the contents of such document, the location of any copies of such document, disposition of such document, the date of the disposition of such document, the reason for such disposition, and the name of the person who ordered or authorized such disposition.

H.    If you cannot fully answer any interrogatory, then you should answer such interrogatory to the fullest extent possible and should indicate the reason for failing to answer fully. Further, you should provide all available information relating to the interrogatory and should indicate the person or persons who can more fully answer the interrogatory.

## INTERROGATORIES

1.    Identify the "local bankruptcy attorney" referenced in the "NOTE" on the first page of the Amended Schedules.

RESPONSE:

2.    Identify all documents that you contend substantiate the monthly income data listed in Schedule I of the Amended Schedules.

RESPONSE:

3.      Identify all documents that you contend substantiate the monthly expense data listed in Schedule J of the Amended Schedules.

RESPONSE:

4.      Identify all documents that you contend substantiate the income data listed in Official Form 122A-1 of the Amended Schedules.

RESPONSE:

5.      Identify all documents that you contend substantiate the expense data listed in Official Form 122A-2 of the Amended Schedules.

RESPONSE:

6.      Identify the licensee of the "Best Case Bankruptcy" software used to prepare the Amended Schedules.

RESPONSE:

7.      Identify all physicians and/or other medical professionals that provided medical care to your daughter, Brianna Cole, on August 25, 2016.

RESPONSE:

## REQUEST FOR PRODUCTION

Pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure, Moon Wright & Houston, PLLC requests that Sandra Dee Cole produce for inspection and copying the documents and things appearing in the attached schedule.  Such production is to take place within thirty (30) days after service hereof at the office of Moon Wright & Houston, PLLC, 121 West Trade Street, Suite 1950, Charlotte, North Carolina 28202 or at such other place as the parties may agree.  Sandra Dee Cole is also required pursuant to Bankruptcy Rule 7034 to serve a written response to this request for production.

## INSTRUCTIONS REGARDING REQUEST FOR PRODUCTION

A.      "Amended Schedules" refers to the *Amended Means Test Calculation 122A-2, Statement of Income, Declaration, 106/206 Summary, Schedule J, Schedule I, Schedule A/B filed by Sandra Dee Cole*, filed in the Base Case on July 28, 2017. [Doc. 84].

B.      "Base Case" refers to the converted Chapter 7 bankruptcy case of Sandra Dee Cole pending in the United States Bankruptcy Court for the Western District of North Carolina bearing case number 16-50322.

C.      "Document" is used in the broadest sense and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any other mechanical or electronic process or writing, or produced by hand, and shall include the original, all non-identical copies and all drafts of any and all agreements, communications, correspondence, memoranda, records, books, summaries of records of personal conversations or interviews, diaries, forecasts, statistical statements, accountants work papers, graphs, charts, accounts, analytical statements, reports and any other writings of whatever description, including but not limited to any information contained in any computer, although not yet printed out, and within your possession, custody or control or in the possession, control or custody of any agent or employee.  In the event that a document requested herein was, but is no longer, in your possession, custody or control, state what disposition was made of it, why, when and by whom.  In addition to the foregoing, "document" specifically includes text or images stored in electronic form (e.g., electronic mail and text messages).

D.      "You" or "your" refers to Sandra Dee Cole and any other persons and/or entities acting on her behalf.

E.      The documents produced pursuant to this Request should be separately produced for each paragraph of the Request or, in the alternative, shall be identified as complying with the particular paragraph or paragraphs of the Request to which they are responsive.

## SCHEDULE OF DOCUMENTS TO BE PRODUCED

1.      All documents that you contend substantiate the amount listed on Line 8h of Schedule I as filed in the Amended Schedules.

RESPONSE:

2.      All documents that you contend substantiate the amount listed on Line 4 of Schedule J as filed in the Amended Schedules.

RESPONSE:

3.      All documents that you contend substantiate the amount listed on Line 4c of Schedule J as filed in the Amended Schedules.

RESPONSE:

4.      All documents that you contend substantiate the amount listed on Line 5 of Schedule J as filed in the Amended Schedules.

RESPONSE:

5.      All documents that you contend substantiate the amount listed on Line 13 of Schedule J as filed in the Amended Schedules.

RESPONSE:

6.    All documents that you contend substantiate the amount listed as "Husband's out-of pocket medical expenses" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

7.    All documents that you contend substantiate the amount listed as "Husband's Auto Maintenance/Gas" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

8.    All documents that you contend substantiate the amount listed as "Husband's Entertainment/Clubs.Recreation" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

9.    All documents that you contend substantiate the amount listed as "Husband's Hotels/Lodging" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

10.    All documents that you contend substantiate the amount listed as "Husband's Cell Phone/Electronics" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

11.    All documents that you contend substantiate the amount listed as "Husband's Clothing/Laundry Expense" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

12.    All documents that you contend substantiate the amount listed as "Husband's Personal Care Products" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

13.    All documents that you contend substantiate the amount listed as "Husband's Misc Expenses" in Line 21 of Schedule J as filed in the Amended Schedules.

RESPONSE:

14.    All documents that you contend substantiate the amount listed as "Husband's secured debt payment – includes tax/insurance" in line 3 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

15.    All documents that you contend substantiate the amount listed as "Husband's non-reimbursable work expenses" in line 3 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

16.    All documents that you contend substantiate the amount listed as "Husband's out-of-pocket medical expenses" in line 3 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

17.    All documents that you contend substantiate the amount listed as "Husband's misc expenses (clothing, recreation, loans, etc)" in line 3 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

18.    All documents (including, but not limited to, contracts, promissory notes, security agreements, financing statements, deeds of trust, mortgages, and account statements) memorializing and/or evidencing all "Husband's secured debt payment – includes tax/insurance" as referenced in line 3 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

19.    All documents (including, but not limited to, contracts, promissory notes, security agreements, financing statements, deeds of trust, mortgages, and account statements) memorializing and/or evidencing all "loans" included in "Husband's misc expenses" as referenced in line 3 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

20.    All documents that you contend substantiate the amount listed in Line 16 of Official Form 122A-2 as filed in the Amended Schedules.

RESPONSE:

21.    All Form K-1s issued to your spouse from January 1, 2014 to the date of your responses to this *Plaintiff's Second Set of Interrogatories and Request for Production to Defendant*.

RESPONSE:

22.    A complete copy of your spouse's filed state and federal income tax returns (and all schedules thereto) for 2016.

RESPONSE:

23.    All drafts of the Amended Schedules.

RESPONSE:

24.    All documents provided by you or on your behalf to any attorney for preparation of the Amended Schedules.

RESPONSE:

25.    All documents consulted or reviewed by you for preparation of the Amended Schedules.

RESPONSE:

26.    All documents containing communications between you and any attorney regarding preparation of the Amended Schedules (whether sent or received by you).

RESPONSE:

27.    All documents containing communications between any person or entity acting on your behalf, including but not limited to your spouse, and any attorney regarding preparation of the Amended Schedules (whether sent or received by such attorney).

RESPONSE:

28.    All documents containing your notes regarding any and all information necessary to the preparation of the Amended Schedules.

RESPONSE:

29.    All documents containing notes of any person or entity acting on your behalf, including but not limited to your spouse, regarding any and all information necessary to the preparation of the Amended Schedules.

RESPONSE:

30.    All documents containing notes of any attorney and/or such attorney's employees, regarding any and all information necessary to the preparation of the Amended Schedules.

RESPONSE:

31.    All documents that you contend substantiate your response to Interrogatory Number 7, above.

RESPONSE:

32.     Copies of all periodic statements for each and every account at PlainsCapital Bank in your name and/or over which you had signatory authority from May 1, 2012 to the present (including, but not limited to, account number 282046).

RESPONSE:

33.     A log consistent with Federal Rule of Evidence 26(b)(5) of all documents you have withheld from production from discovery in this adversary proceeding on the grounds of privilege or other protection from disclosure.

RESPONSE:

**REMINDER: "document" as used in this Request for Production of Documents refers to text or images stored in electronic form as well as conventional written documents.**

Dated: Charlotte, North Carolina
         August 7, 2017

**MOON WRIGHT & HOUSTON, PLLC**

Caleb Brown (NC Bar No. 41131)
121 W. Trade Street, Suite 1950
Charlotte, North Carolina 28202
Telephone:  (704) 944-6560
Facsimile:  (704) 944-0380
*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Plaintiff's Second Set of Interrogatories and Request for Production to Defendant* has this date been served upon the persons named below by depositing a copy of the same in the United States mail (regular and certified), sufficient postage prepaid, addressed as follows:

Sandra Dee Cole
143 Sleepy Cove Trail
Mooresville, NC 28117

Dated: Charlotte, North Carolina
August 7, 2017

**MOON WRIGHT & HOUSTON, PLLC**

Caleb Brown (NC Bar No. 41131)
121 W. Trade Street, Suite 1950
Charlotte, North Carolina 28202
Telephone: (704) 944-6560
Facsimile: (704) 944-0380
*Counsel for the Plaintiff*

# EXHIBIT B

From: "Sandra Cole" <ssdcole@gmail.com>
Date: Aug 4, 2017 4:16 PM
Subject: Sandra Cole Interrogatorries
To: "Richard Wright" <rwright@mwhattorneys.com>, "Brown"
<cbrown@mwhattorneys.com>
Cc:


Richard,

I am yet again in receipt of your standard mail reply dated July 28th to my email July 28th email
that I received today (August 4th,2017).  Your letter asks me to confirm by August 4th that I'm
undertaking the effort to redress your interrogatories with a new deadline of August 11th to
redress.  I am perplexed as to why you're firm continues to complicate this communication matter.
Why cant you do both, email and mail so we don't have these long time lags, what you're doing is
creating unnecessary delays and there's no good excuse to exclude email communications which
expedite timelines.  As it stands because of unwillingness to email me this letter you purportedly
completed on July 28th I lost seven days I could have spent trying to determine what it is you're
contending I haven't answered.  More notably in your July 28th letter you've completely ignored yet
again my offer to confer.

The expense items are in the four years of bank statements from Founders and Suntrust you've
been provided and the income on the income documents submitted by Mr cole.

Would you like to inspect the documents outside the Dropbox?  I can print them and bring them if
you'll confer so I might understand what you're looking for from me.

While I'm willing to revisit the request and responses to the interrogatories, Your recent letter still
doesn't clarify what you want since I've evidenced the expenses via bank statements?

To be clear, I'm willing to redress the interrogatories and amend where appropriate and since I've
lost seven days due to your unwillingness to email I think it fair and reasonable you extend that
August 11th deadline to August 18th.  Therefore, I will revisit/revise but ask you extend the date to
the 18th since your decision to communicate strictly via us mail has caused an unnecessary seven
day delay.


Regards,

# EXHIBIT C

```
┌─────────────────────────────────┐
│   FILED & JUDGMENT ENTERED       │
│        David E. Weich            │
│   ┌─────────────────────────┐    │
│   │      Mar 23 2010        │    │
│   │                         │    │
│   └─────────────────────────┘    │
│      Clerk, U.S. Bankruptcy Court│
│     Western District of North Carolina │
└─────────────────────────────────┘
```



J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
WILKESBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 08-51243 |
| | ) | Chapter 7 |
| **RONALD CREIGH HILL** | ) | |
| **SABRINA COLLINS HILL,** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| **ANDRESEN & ARRONTE, PLLC** | ) | Adversary Proceeding No. |
| | ) | 09-05002 |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **RONALD CREIGH HILL** | ) | |
| **SABRINA COLLINS HILL** | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM ORDER

A bench trial was held on January 21, 2010 in this §
523(a)(2) dischargeability action brought by Plaintiff Andresen
& Arronte, PLLC, ("the Firm"), against two of its clients,
Debtor/Defendants Ronald and Sabrina Hill (collectively "the
Hills"). The debt in question stems from the Firm's defense of
the Hills in a prepetition state court lawsuit. The Firm
maintains the Hills induced it to continue the representation

1

through false assurances of payment. The Firm believes its $47,258.51 debt should be deemed nondischargeable under 11 § 523(a)(2), as being occasioned by misrepresentations, false pretenses and fraud. The Hills deny making any false assertions.

At trial, the Hills moved for Directed Verdict after the Firm presented its case-in-chief. The Court deferred a ruling on that motion until after the Hills presented the Defendants' case. Now having heard all the evidence, the Court **GRANTS** Defendants' Motion for Directed Verdict as against Sabrina Hill but **DENIES** it as to Creigh Hill. As to a trial verdict, the Court **FINDS IN FAVOR OF DEFENDANT** Creigh Hill. As to both Debtors, the debts owed to the Firm are dischargeable.

## FINDINGS OF FACT

In July 2007, the Hills entered into a contract ("Sales Contract") to sell a one-half interest in their RE/MAX real estate business to Kelly Lake ("Lake"). Shortly after Lake made a $150,000 payment pursuant to the Sales Contract, Lake changed her mind and attempted to rescind the Sales Contract. Lake filed a lawsuit ("Lake action") against the Hills in Mecklenburg County, North Carolina alleging breach of contract in connection with the Sales Contract.

In November 2007, the Hills retained the Firm to defend the Lake action and to assert counterclaims on their behalf. After executing a written fee agreement, the Hills provided the Firm

2

with a non-refundable retainer and agreed to make payment for all subsequent legal services in accordance with the fee agreement.   The Firm then commenced its representation of the Hills in the Lake action.

Shortly thereafter, two attorneys left the Firm to join a new law practice. The Firm's sole legal assistant ("Walle") abruptly resigned and also joined the new practice. When it was learned that Walle's new firm represented Lake in the Lake action, the Hills and the Firm were disturbed about the apparent conflict of interest, leading to actions in the state court seeking to disqualify Lake's attorneys.

During discussions between the Firm and Creigh Hill ("Creigh") regarding the conflict issue, the first indicia of the Hills' financial distress began to surface. On January 26, 2008, Creigh emailed the Firm to discuss litigation strategy and the conflict of interest matter. His email notes the financial strain that the Hills were experiencing, "We are troubled about the additional costs we may incur because of this incident and additional motions that will have to be filed...We have been concerned of the cost of these motions and overall strategy of the case as mentioned several times before...we would like to stall this as long and as inexpensively as possible."   (Def.'s Tr. Ex. 1.)

Even after the conflict of interest issue was resolved, Creigh kept in close contact with the Firm regarding the litigation, not only as to strategy, but also as to its costs, the Hills' financial predicament and how Creigh hoped to pay the Firm. On March 18, 2008, Creigh emailed the Firm with a payment update for the Hills' outstanding legal bill. Creigh told the Firm that he was refinancing his home to help with legal fees. (Def.'s Tr. Ex. 2.) Shortly thereafter, on April 7, 2008, Creigh emailed the Firm to advise that his home appraisal was being completed. His email clearly states that "[the refinancing] is the only option I have. I understand if you need to hold up on the case until then." (Def.'s Tr. Ex. 3.) The Firm, content with Creigh's hope of refinancing, continued its representation.

Creigh updated the Firm about his decreasing payment ability and consequently sought to slow down the litigation with his May 13, 2008 email, "The appraisers are being extremely conservative on the value of my home. I will not be able to refinance because of this...**I understand if you need to withdrawal as my counsel until I can get you paid.** I mentioned to [the Firm's paralegal] that we needed to delay these proceedings as much as possible to allow me time to earn the funds to pay as we go. I have no choice. Is there any way we can delay everything for at least another month? This would

4

allow me more time to seek other options." (Def.'s Tr. Ex. 4)(emphasis in original).

When the Firm replied that postponement of the depositions in question was not possible (Def.'s Tr. Ex. 5.), Creigh reiterated the Hills' financial predicament. His May 14, 2008 email states, "We have no choice...I need additional time to work to pay your bill." *Id.* Despite the Hills' mounting legal bill[1], the Firm continued the representation.

On August 15, 2008, Creigh emailed the Firm asking to settle the Lake action to avoid the cost of a trial. (Def.'s Tr. Ex. 6.) Ken Andressen, principal of the Firm, responded, "I understand that you don't want to incur more expense by going through with a trial, but this is not like checking out of a hotel room where you can decide that you simply don't want to stay anymore. If you want to cave into her demand, you can get out of a trial...we have made the counter offer. Now we need to see if she will accept it. In the meantime, I have to continue preparing for a trial." *Id.*

Creigh and the Firm elected to go forward. Afterward, Creigh emailed the Firm on September 29, 2008, again stating his hope to pay them: "I will work on funds this week to get a payment into [the Firm]." (Pl.'s Tr. Ex. 9.)

---

[1] A chart of the progression of legal fees is located at the close of the findings of fact.

5

On October 21, 2008 (notably the same day Creigh took his pre-bankruptcy credit counseling), Creigh emailed the Firm again addressing both the Hill's outstanding bill and their financial infirmities, "I have been working on every option to raise money to pay you...At this point I'm going to lose my home due to foreclosure, so there goes my equity...What options do I have if any with you?" (Def.'s Tr. Ex. 7.)    The Firm responded by proposing that Creigh and Sabrina sign a promissory note and give it a deed of trust on the Hills' house. *Id.* "[The Firm] know[s] that it is mortgaged to the hilt and that [the Firm] probably will not see a dime if the property is foreclosed on; but, still, it is something." *Id.* The record does not reveal whether Creigh or Sabrina did in fact sign a promissory note and/or sign over the deed of trust to the Hills' house.

Meanwhile settlement negotiations were progressing in the Lake action. The Firm sent Creigh an email on October 28, 2008 asking him to review a list of business assets proposed to be divided between the Hills and Lake.    (Def.'s Tr. Ex. 8.) A settlement document was executed by the Hills on November 10, 2008. (Pl.'s Tr. Ex. 11.)

Unbeknownst to the Firm, during this time period, the Hills' home had been under attack by creditors.    First, on July 8, 2008, the Defendants' mortgage lender recorded an Appointment and Substitution of Trustee in Iredell County. (Pl.'s Tr. Ex.

14.)  Although the foreclosure sale of the home would not occur until June of the following year,[2] the property was in jeopardy from this point forward. Second, at some point, Branch Bank & Trust Co. obtained a judgment against Creigh and initiated an execution. In September 2008, Creigh and/or Sabrina Hill claimed exemptions in the house as against BB&T's judgment lien. (Pl.'s Tr. Ex. 13.)

On the verge of having their home sold, the Hills filed for bankruptcy protection under Chapter 7 on October 31, 2008. The Firm did not learn of the Hills' bankruptcy until after it was filed, on November 10, 2008. (Def.'s Tr. Ex. 9.) Ironically, the Lake action settled eleven (11) days after bankruptcy, on November 11, 2008, with an agreed division of the business assets.[3]

The Hills' bankruptcy filing left the Firm with a large unpaid bill. The chart below summarizes the progression of these legal fees over the relevant time periods.

| DATE | BALANCE OWED |
|------|--------------|
| January 30, 2008 | $10,368.75 |
| March 31, 2008 | $19,630.00 |

[2] That foreclosure was stayed by the Hills' bankruptcy, but was finally completed on July 9, 2009, when a Substitute Trustee's Deed was recorded in Iredell County. (Pl.'s Tr. Ex. 15.)

[3] Because the settlement was reached after bankruptcy, technically, consent of the Trustee and court approval were required to make the settlement effective.

7

| May 30, 2008 | $28,905.00 |
| August 15, 2008 | $45,731.50 |
| October 30, 2008 | $45,978.51 |
| November 6, 2008 | $46,168.51 |
| November 8, 2008 | $47,068.51 |
| November 11, 2008 | $47,258.51 |

(Pl.'s Tr. Ex. 2.)

## LEGAL POSITIONS OF THE PARTIES

The Firm claims the Hills' debt for legal services is not dischargeable under § 523(a)(2) because promises of future payment on the debt were repeatedly made and, thereby, induced the firm to continue its representation. The Firm asserts that promises of payment were made knowing that such payments could not and would not be made. Specifically, the Firm maintains that the Debtors' statements amount to misrepresentations, false pretenses and/or actual fraud pursuant to § 523(a)(2)(A).

The Hills maintain that Creigh's statements were not false misrepresentations but were instead truthful expressions of the Hills' intentions to pay the Firm when they could. The Hills note that throughout the representation, Creigh kept the Firm apprised of the Hills' financial struggles. Consequently, not only was there no intention to mislead by the Hills, but also

the Firm could not have relied on any such statement to its detriment.

Additionally, in their Motion for Directed Verdict, and as to Sabrina Hill ("Sabrina"), the Hills assert that the Firm presented no evidence showing any statement, let alone a misrepresentation, by Sabrina. Thus, the action should be dismissed as to her and her liability discharged. While Sabrina admittedly made no such promises, the Firm attributes all statements made by Creigh to Sabrina under an agency theory.

Lastly, the Firm maintains that the statements made by Creigh do not qualify as a "statement respecting the debtor's...financial condition" under § 523(a)(2)(A). The Hills argue that regardless of whether the statements "respect[] the debtor's...financial condition," the Firm has failed to prove by a preponderance of evidence that the elements of § 523(a)(2)(A) or (a)(2)(B).

## CONCLUSIONS OF LAW

### A.   SABRINA COLLINS HILL

Directed verdict is appropriate when the evidence is such, without weighing the credibility of witnesses, that there is only one conclusion that reasonable jurors could have reached. *Decker v. UNUM Provident Corp.*, 87 Fed. Appx. 304, 308 (4th Cir. 2004). "[A]n issue can only be submitted to a jury when it is supported by substantial evidence that shows a probability and

9

not mere possibility of proof." *Id.* (citing *E. Auto Distribs., Inc. v Peugeot Motors*, 795 F.2d 329, 335 (4th Cir. 1986)).

Here, the Firm has offered no proof of any misrepresentation made by Sabrina specifically. Instead, the Firm seeks to impute Creigh's alleged misrepresentations to Sabrina as her agent, entirely based on the fact that they are married.

An agency relationship exists when a contract or conduct establishes that an entity or individual is controlled by a principal and works for the benefit of the principal. *Smith v. United Recovery, Inc.*, 222 Fed. Appx. 248, *2 (4th Cir. 2007) (unpublished opinion) (citing 1 *Michie's Jurisprudence*, Agency § 2). Within the confines of agency theory, the Fourth Circuit has affirmed that a wife is not the agent of her husband strictly by force of the marital relationship. *Pioneer Savings Bank, Inc. v. Huang (In re* Tara of North Hills), 116 B.R. 455, 462 (E.D.N.C. 1989), *aff'd*, 1990 WL 77088 (4th Cir. 1990). Instead, the Fourth Circuit believes the mutual confidence associated with such relationship is relevant to the issue of agency. *Id.*

In *Tara of North Hills*, the Fourth Circuit looked at whether a wife acted not only on her own behalf but also as an agent for her husband when she signed a consent order. *Id.* The debtor, Tara of North Hills, was a North Carolina general partnership that owned an apartment complex. *Id.* at 457. Tara's

10

three (3) general partners were Dr. Huang, Mrs. Huang, and Mr. Avent. *Id.* at 458.

Avent filed an involuntary petition against the partnership, forcing Tara into Chapter 11. *Id.* The Huangs sought to dismiss the case. While their motion was pending, a creditor filed its own motions seeking relief from stay, adequate protection and restriction of cash collateral use. *Id.* The parties then negotiated an agreed appointment of a Chapter 11 trustee. *Id.* Their agreement was memorialized in a written consent order. *Id.* at 458-49.

Once the other parties signed the consent order, the Huangs inserted additional language into the order and signed the consent order. *Id.* at 459. After Mrs. Huang was informed that the additional language had to be stricken, Mrs. Huang agreed to strike the additional language and purportedly signed the consent order in its original form for herself and her husband. *Id.* at 460-61.

A year and a half later, the Huangs moved to set aside the consent order, arguing that while Mrs. Huang may have consented to the amended order for herself, there was no evidence that she was authorized to act as the agent for her husband. *Id.* at 458-62.

The district court affirmed the findings of facts and conclusions of law found by the bankruptcy judge and held based

11

upon the strong factual record presented at the bankruptcy court's hearing on the matter that Mrs. Huang acted on behalf of both herself and her husband. That evidence demonstrated that both Huangs were active partners in the partnership; Mrs. Huang had previously acted as her husband's agent in conjunction with partnership business; and that prior to signing the amended consent order Mrs. Huang had spoken to a person on the telephone that she identified as her husband. *See id.* On appeal, the Fourth Circuit affirmed the reasoning of the district court. *Pioneer Savings Bank, Inc. v. Huang* (*In re* Tara of North Hills), 904 F.2d 701, 701 (4th Cir. 1990).

Several other courts have also held that, "in the case of husband-and-wife debtors, the marital relationship alone is not enough to impute one spouse's fraud to the other for nondischargeability purposes." *Tower Credit, Inc. v. Gauthier* (*In re* Gauthier), 2009 WL 3378251, at *2 (5th Cir. 2009) (unpublished opinion)(citing *Allison v. Roberts* (*In re* Allison), 960 F.2d 481, 485-86 (5th Cir. 1992)). *See also Boyd v. Loignon* (*In re* Loignon), 308 B.R. 243, 250 (Bankr. M.D.N.C. 2004) (finding no evidence of a business relationship between defendants and "marital status alone does not create an agency relationship")(quoting *In re* Tsurukawa, 258 B.R. 192, 198 (9th Cir. BAP 2001)).

12

For example, In *Tower Credit*, a creditor brought a dischargeability objection against both husband and wife debtors, alleging fraud by the husband. *Id.* at *1. Specifically, Tower Credit alleged that the husband made fraudulent misrepresentations on his application for a loan. However, Tower Credit sought to impute the husband's alleged fraud to the wife solely on the basis of their marital relationship. *Id.* The court found no suggestion that the wife had any knowledge or involvement in the husband's alleged fraud, and, therefore, granted the debtors' motion to dismiss as to the wife. *Id.* at *2-3.

The facts of the present case are quite similar to those appearing in the *Tower Credit* case. Here, the Firm has offered no proof that Sabrina had any involvement with the email statements made by Creigh (e.g. evidence of discussions between Creigh and Sabrina regarding the email communication between Creigh and the Firm or evidence of Sabrina's consent to such statements by Creigh on her behalf). Nor has the Firm established that Sabrina had any knowledge of these statements before or even after their dissemination. Consequently, this Court concludes that Creigh was not acting as Sabrina's agent when he sent the Firm these emails. Thus, the Court **GRANTS** the Hills' Directed Verdict Motion in favor of Sabrina Hill.

### B.   RONALD CREIGH HILL

Turning to the Hills' Motion for Directed Verdict, as to Creigh, the Court finds that evidence offered by the Firm does not lead to only one conclusion that reasonable jurors could have reached. Therefore, the Hills' Directed Verdict Motion as to Creigh Hill is **DENIED**.

As to the Firm's § 523(a)(2)(A) and § 523(a)(2)(B) claims, the Court will discuss each claim in turn.

1. <u>§ 523(a)(2)(A) - Debts for obtaining money, property, or services by false pretenses, misrepresentations, or actual fraud</u>

Section 523(a)(2)(A) of the Code states in part,

A discharge ... of this title does not discharge an individual debtor from any debt –
(2) for money, property, services..., to the extent obtained by –
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. §523(a)(2)(A).

As an initial matter, the parties dispute whether Creigh's emails qualify as "statement[s] respecting the debtor's ... financial condition" within the meaning of subpart (A). The phrase "respecting the debtor's ...financial condition" is not defined in the Bankruptcy Code nor is the term "financial condition," and the courts are sharply divided on the proper scope of the term. 4 *Collier on Bankruptcy*, ¶ 523.08[2][c] (16th ed. rev. 2009). Some courts hold that the term only refers to the debtor's overall financial condition, such as solvency or

net worth. *Id.* *Other* courts use the term in a broader sense and conclude that factual representations about asset ownership or the non-existence of an encumbrance on an asset also constitute "financial condition." *Id.*

The scope of "financial condition" is a question of first impression in this district. However, such an analysis may not be necessary in the present case if the other elements of § 523(a)(2) are not met. Therefore, the Court elects to address the other elements of § 523(a)(2) first, and if the standard of proof is satisfied, the Court will address the "financial condition" issue.

A.   *Fraudulent Misrepresentation*

In order to have Creigh's liability deemed nondischargeable under § 523(a)(2)(A), the Firm must establish that the debt was incurred through:

(1)   a fraudulent misrepresentation;
(2)   which induced the Firm to act or refrain from acting;
(3)   which caused harm to the Firm; and
(4)   upon which the Firm justifiably relied.

*See Foley & Lardner v. Biondo* (*In re* Biondo), 180 F.3d 126, 134 (4th Cir. 1999). As the party challenging the dischargeability of debt, the Firm has the burden of establishing each of the foregoing elements by a preponderance of evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Turning to the first element, fraudulent misrepresentation, this element is satisfied if the debtor's representation was

15

known to be false or recklessly made without knowing whether it was true or false. *Boyuka v. White* (*In re* White), 128 Fed. Appx., 994, at *3 (4th cir. 2005) (unpublished opinion)(citing *In re* Woolley, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991)). And, a debtor's misstatement of intention is only "fraudulent if he does not have that intention at the time he makes the representation." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting Restatement (Second) of Torts § 530(1) (1976)).

However, "a promise or declaration, standing alone, is insufficient to support a claim under § 523(a)(2)(A), because a promise to perform some act in the future, without more, does not constitute a representation for purposes of § 523(a)(2)(A)." *Riddle Farm Equi. V. Boles* (*In re* Boles)(Ad. Pro. No. 04-6027)(Bankr. M.D.N.C. 2005)(unpublished) (citing *Allison v. Roberts* (*In re* Allison), 960 F.2d 481, 484 (5th Cir. 1992)("[A] promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached.") Finally, a breach of contract, even an intentional breach, is not a fraud as contemplated by § 523(a)(2)(A). *See Strum v. Exxon Co.*, 15 F.3d 327, 331 (4th Cir. 1994).

Here, the Court concludes that Creigh's statements up until the date of his bankruptcy credit counseling do not qualify as

16

misrepresentations. Creigh's emails illustrate a client communicating about hope for future payment at an unspecified later date. The record fails to prove that Creigh never intended to pay for legal services at the time he made any of those promises. Rather, Creigh's emails suggest that he had every intention of paying for the Firm's legal services once he acquired a means of payment. Creigh's belief (that he would be able to pay the firm) may have been overly optimistic, but such optimism is common among people facing financial difficulty. However unrealistic, Creigh's intention appears earnestly held.

In any event, Creigh was forthright with the Firm about his lack of present resources and his need to utilize other options (more work hours, refinancing of his house, etc.) to pay the Firm's bill. Therefore, the Firm has not satisfied its burden of proof on the first element required under § 523(a)(2)(A) for the majority of the Hills' outstanding debt.

A separate issue to assess is whether the Hills' failure to apprise the Firm about the Hills' impending bankruptcy (after receiving credit counseling) constitutes misrepresentations under § 523(a)(2)(A). In an unpublished opinion decided in 2009, the Fourth Circuit affirmed a bankruptcy court's finding that a debtor's deliberate nondisclosure of a second mortgage while attempting to obtain a bank loan was "clinching proof that [the debtor] misled the bank and that [the debtor] deliberately

17

furnished a stale financial disclosure and a stale title abstract which [the debtor] knew did not reflect the [previous] Loan and mortgage." *Colombo Bank v. Sharp* (*In re* Sharp), 340 Fed. Appx. 899, 903 (4th Cir. 2009). The misrepresentation, however, standing alone was not enough to warrant nondischargeability under § 523(a)(2)(A), because this pre-funding nondisclosure was not material. *Id*. Rather, the evidence showed that the bank was "hot" to make the loan and the bank's loss was essentially caused by the parties' shared mistaken evaluations of the debtor's ability to repay the loan from income and/or the value of his business and the value of properties listed as collateral. *Id.*

Under *Sharp*, nondisclosure of the Hills' bankruptcy counseling to the Firm could qualify as a deliberate act of nondisclosure in an attempt to mislead. At least in theory,[4] the Hills could have sent an email to the Firm on October 21, 2008, advising that they had taken a credit-counseling course preparatory to filing bankruptcy. However, the Firm fails to cite, and the Court cannot find, any authority that imposes a duty on the Hills to inform the Firm that he was contemplating bankruptcy.

And even if such a duty were to exist, such nondisclosure pales when compared to the *Sharp* facts to the point of

---

[4] In twenty-five (25) years of involvement in bankruptcy cases, the undersigned can recall no circumstance where a debtor ever made such announcement to a creditor.

18

insignificance. If the Hills' failed to mention the counseling session, on the very same day he sent the Firm an email disclosing a much more significant financial calamity, the loss of the family home through foreclosure.

Like the bank in *Sharp*, the Firm was "hot" to see the litigation through, likely because the Hills counterclaims provided the Firm its best chance of being paid. This attitude is reflected in Andresen's email statement that, "I'd rather try a case than eat." *See* (Def.'s Tr. Ex. 6.)

In toto, the facts presented are insufficient to demonstrate a deliberate misrepresentation by concealment of material financial information to the Firm. Therefore, the Court concludes that the Hills' nonstatement concerning the post credit counseling do not qualify as misrepresentations under § 523(a)(2)(A).[5]

For sake of completion, the Court will address the remaining elements of § 523(a)(2) and the remaining claim under § 523(a)(2)(B). The second element required for a nondischargeable debt under § 523(a)(2)(A) is whether the Firm was induced by Creigh's representations to either act or refrain from acting. Again, the Court concludes that Creigh's statements were merely promises to pay at some point in the future when funds became available and not knowingly false

---

[5] Even if this was a misrepresentation by omission, at most, only the fees incurred after this point would be nondischargeable

statements intended to induce the Firm to continue representation.

Third, the element of causation is satisfied because the Firm did incur legal costs as documented by its billing statement. (P's Tr. Ex. 2.)

The final element is whether the Firm justifiably relied upon Creigh's statements concerning payments. To satisfy the justifiable reliance requirement, the creditor must prove it actually relied upon the debtor's misrepresentations. *In re Sharp*, 340 Fed. Appx. at 907 (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)). Once the creditor establishes actual reliance, the creditor is then obliged to demonstrate that such reliance was justified. *Id.*

Justifiable reliance is a minimal, subjective standard that encompasses "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *See Field*, 516 U.S. at 71 (citing Restatement of Torts (Second) § 545A, cmt. B(1976)).

Although, the justifiable reliance element does not typically give rise to a duty to investigate, a creditor is not entitled to "blindly rel[y] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. *In*

20

*re* Sharp, 340 Fed. Appx. at 906-07 (citing *Field*, 516 U.S. at 71).  "A duty to investigate can arise when the surrounding circumstances give red flags that merit further investigation; this analysis turns on 'an individual standard of the [creditor's] own capacity and the knowledge which he has.'" *In re* Sharp, 340 Fed. Appx. at 906-07 (citing *Field*, 516 U.S. at 72).

Here, the Firm argues that it justifiably relied upon Creigh's statements of payment.  The Court finds otherwise.  The Firm was a sophisticated party that was told on a regular basis by a client that its prospects for payments were continuing to diminish.  Creigh even went so far as to ask the Firm whether it would withdraw due to the Hills' lack of financial resources. Despite these obvious warning flags, the Firm continued its representation and thereby gambled future services against the prospect of being paid (either directly or through a litigation recovery).  Thus, the Court finds that the Firm failed to establish all the necessary elements required under § 523(a)(2)(A).

   B.   *Actual Fraud*

The Firm alternatively claims that the Hills' statements (and nonstatements) and failure to pay its bills constitute an actual fraud under § 523(a)(2)(A).  "[A] creditor's proof of actual fraud under subsection (2)(A) requires satisfaction of

21

the elements of common law fraud: '(1) false representation, (2) knowledge that the misrepresentation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages.'" *In re* Sharp, 340 Fed. Appx. at 901 (citing *Nunnery v. Rountree* (*In re* Roundtree), 478 F.3d 215, 218 (4th Cir. 2007)).

As previously discussed, the Firm established proximate cause of damages but has failed to establish either a false misrepresentation or justifiable reliance. However, again in order to complete the record, the Court will address the remaining element of intent. The intent requirement for actual fraud parallels the knowledge requirement for misrepresentation—"A false representation made under circumstances where [the maker] should have known of the falsity is one made with reckless disregard for the truth." *See Medlock v. Meahyen* (*In re* Meahyen*), 422 B.R. 192, 202 (Bankr. D. Minn. 2010) (citing *The Merchants Nat'l Bank of Winona v. Moen* (*In re* Moen*), 238 B.R. 785 (8th Cir. 1999). Further, the Restatement (Second) of Torts states, "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of the representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." *Id.* (Citing Rest. (2d) Torts § 526 (1977)).

22

For the reasons outlined above, the Court finds that, at the time of each statement, Creigh did not believe or know that he would be unable to make a future payment after benefiting from continued legal services. As discussed previously, Creigh's statements are indicative of an individual attempting to keep his head afloat while his financial prospects continued to sink. His statements to the Firm are frank disclosures of his family's financial predicament and its affect on the Firm.  Thus, the Firm has failed to prove by a preponderance of evidence that Creigh manifested the proper intent as required by § 523(a)(2)(A).

   C.   *Respecting the Debtor's Financial Condition*

Turning to the final element required under § 523(a)(2)(A), "respecting the debtor's...financial condition," the Court elects not to address the scope of the phrase and specifically the issue of whether Creigh's statements qualify as "a statement respecting the debtor's...financial condition."  As previously mentioned, the phrase is ambiguously written in the Code, causing various interpretations among bankruptcy courts.  Since the Firm has not met its burden of proof of establishing the other elements of § 523(a)(2)(A), the Court elects to reserve interpretation of the phrase to another day.

2. § 523(a)(2)(B) - Debts for obtaining money, property, services by use of a false financial statement

Addressing the Firm's final claim under § 523(a)(2)(B), the Court also concludes the Firm failed to meet its burden of proof on this claim as well. A creditor must prove by a preponderance of the evidence that the debt was obtained by the use of a statement:

(1) in writing;

(2) that is materially false;

(3) respecting the debtor's or an insider's financial condition;

(4) on which the creditor to whom the debtor is liable for money, property, services or credit reasonably relied;

(5) that the debtor caused to be made or published with intent to decide. 11 U.S.C. §523(a)(2)(B).

Ignoring for the moment those elements of subpart (B) for which courts have reached differing interpretations (e.g. statement in writing and respecting a debtor's financial condition), the first element, whether a statement is materially false, is satisfied if the statement paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *Cmty. Bank of Homewood-Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992). For reasons already stated, this Court concludes that Creigh's

24

statements do not paint a substantially untruthful picture of his financial condition.

Next, the reasonable reliance standard under § 523(a)(2)(B) imposes a more demanding standard than the justifiable reliance under § 523(a)(2)(A). *See Field*, 516 U.S. at 61. Just like justifiable reliance, reasonable reliance also requires actual reliance. *Id.* at 68. In order to evaluate reasonable reliance, a court must objectively assess the circumstances to determine whether the creditor exercised "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." *In re Sharp*, 340 Fed. Appx. at 908 (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995)).

Here, the Firm did not exercise the degree of care that a reasonably cautious person or law firm would exercise. The Firm was repeatedly apprised of the Hills' precarious financial position and was aware of their likely inability to pay the outstanding legal bill. The Firm overlooks the reality that it knew of Hills' financial despair and yet continued to perform work. The only reasonable interpretation of these contradictory facts is that the Firm believed that its best prospect for payment was to see the Lake action through and be repaid out of any recovery.

The Firm's reliance was neither justifiable nor reasonable. With each of Creigh's emails asking for more time to earn money or seeking withdrawal due to nonpayment, the Firm was shown a red flag, which in each case it disregarded. Clearly, the Firm closed its eyes to the Hills' inability to pay. The Firm failed to establish reasonable reliance pursuant to § 523(a)(2)(B).

With two of the elements of § 523(a)(2)(B) absent, there is no need to address the more controversial issues of (1) whether Creigh's statements via email would satisfy the "statement in writing" criteria and (2) whether Creigh's statements qualify as "statements respecting a debtor's financial condition." Those issues are reserved for another day.

Therefore, the Court Orders:

(1) Defendants' Motion for Directed Verdict as to Sabrina Collins Hill is **GRANTED**;

(2) Defendants' Motion for Directed Verdict as to Ronald Creigh Hill is **DENIED**; and

(3) The Defendants' debt to Plaintiff is deemed **DISCHARGEABLE**.

**SO ORDERED.**

This Order has been signed electronically.      United States Bankruptcy Court
The Judge's signature and Court's seal
appear at the top of the Order.